**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

WILLIAM MILNE and W.M. MILNE &
ASSOCIATES CO.,

        Plaintiffs,                Case No.08-13643

v.                                  HON. MARIANNE O. BATTANI

ACCURCAST, INC.

        Defendant.

_____/

**OPINION AND ORDER GRANTING DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT**

**I.    INTRODUCTION**

Before the Court is Defendant Accurcast Inc.'s Motion for Summary Judgment. (Doc. 20). In their complaint, Plaintiffs W.M. Milne & Associates and William Milne (collectively "Milne") allege that Accurcast's failure to pay Milne all of the commissions he earned constituted both a breach of contract (Count 1) and a violation of the Michigan Sales Representatives Act ("MSRA"), Michigan Compiled Laws 600.2961 *et seq.* (Count 3). Milne's complaint also requests an accounting of customer payments to Accurcast in order to determine what commissions Accurcast has failed to pay to Milne (Count 2). For the reasons discussed below, the Court grants Accurcast's Motion for Summary Judgment.

**II.     STATEMENT OF FACTS**

On February 15, 2006, Accurcast and Milne entered into a Sales Agency Agreement. This agreement made Milne Accurcast's exclusive sales representative to (1) MagnaDrivetrain[1] ("Magna"); (2) Daimler Chrylser; (3) Fermer Precision ("Fermer"); (4) Nationwide Precision ("Nationwide"); and (5) Diversified Machine Inc. ("Diversified"). The Agreement could be terminated by either party for any reason upon 90 days written notice. Accurcast could terminate the agreement without notice, however, if Milne breached any material term of the agreement. Under the agreement, Milne was required to, among other things,

> (a) advertise and promote the sale of Products and make regular and sufficient contact with the Exclusive Customers;
>
> (b) promote Accurcast positively;
>
>  . . .
>
> (d) satisfy and service the Exclusive Customers;
>
> (e) devote the required time, attention and efforts of as many of its employees as necessary to properly and professionally fulfil [sic] all of its obligations arising under this Agreement;
>
> . . .
>
> (i) upon request by Accurcast, assist Accurcast in the collection of all accounts receivables arising from the sales of Products. . . .

Milne was to be paid a commission for his services within 10 days of Accurcast's receipt of payment for applicable sales, or at a time upon which the parties mutually agreed. Milne also was to be paid commissions after the termination of the agreement for the

---

[1] Magna was formerly NPG Syracuse, and it is referred to as NPG in some of the filings with the Court.

duration of all programs resulting from orders placed before the termination of the agreement as a result of Milne's efforts. If Accurcast validly terminated the agreement without notice, however, Milne was not entitled to any post-termination compensation. Under the Sales Agency Agreement's "Governing Law" provision the agreement was to be governed by and construed in accordance with the laws of Ontario.

An August 25, 2008, letter to Milne from Jeffrey McLaughlin, Accurcast's Vice President of Marketing and Engineering, stated that Accurcast was terminating the sales agreement without notice because Milne had breached the agreement by (1) failing to promote Accurcast positively or satisfy and service the customers; (2) making comments to Magna's buyer and supplier personnel that were critical of Accurcast and its management; and (3) failing to provide accurate, complete, and timely information to Magna and component suppliers and withholding important information from us.

McLaughlin testified that Francesca Demars, a buyer for Magna, told him in 2008 that Milne was throwing Accurcast "under the bus." In particular, Demars told McLaughlin that Milne had indicated that Accurcast was experiencing financial difficulties that might prevent it from fulfilling its obligations to Magna. Milne also had criticized Accurcast's management. McLaughlin noted that there had been "quite a few complaints" from Demars in the past about Milne.

McLaughlin indicated that the termination letter's statement that Milne had failed to promote Accurcast positively or satisfy and service the exclusive customers was referring to the aforementioned statements by Demars and to the unwillingness of the Magna purchasing group to deal with Milne. McLaughlin noted that Milne also had

failed to assist Accurcast in the collection of accounts receivables as was required by the Sales Agency Agreement, and that this had gone on since 2006.

McLaughlin testified that he signed Milne's sales agreement in Wallaceburg, Ontario, which is Accurcast's only plant. In addition, Milne traveled to Wallaceburg during the negotiations of the contract. Furthermore, the customers that Milne dealt with submitted their orders to Accurcast in Wallaceburg. McLaughlin acknowledged that one of the customers that Milne dealt with for Accurcast — DMI — was located in Michigan. In addition, Magna has a large office in the Detroit area. The work that Accurcast gets from General Motors was arranged in Michigan, but the orders came from General Motors of Canada. Orders from Nationwide, Fermer, and Magna indicated that the product was sold and shipped to the customers in New York. An order from Daimler Chrysler indicated that it was sold to Daimler Chrysler in Detroit and shipped to Daimler Chrysler in Ontario.

Mitchell Goldman, Accurcast's President, stated in a declaration that Milne earned a total of US$166,434.77 and CAD$2,339.48 over the course of their contractual relationship. Accurcast paid Milne this entire amount with the exception of US$3,560.13 for orders from which Accurcast has not received payment from the customer.

In a deposition, Goldman stated that Demars told him she had been unable to contact Milne and that she was frustrated with him. She also said that Milne had thrown Accurcast under the bus. Goldman asked her what she meant by that, and she said that he had talked negatively about Accurcast's financials and about the ability of certain Accurcast employees. In addition, Demars stated that Milne told her that he was working as quickly as he could and that any delays were Accurcast's fault. Demars also

4

said that she would not do business with Milne anymore.  Because Demars refused to speak to Milne, Goldman concluded that "essentially the only way to continue with Magna and try and salvage a relationship that in our opinion was destroyed by [Milne] was to have him no longer talk to her, at her request."

Goldman testified that the sales agreement with Milne was terminated because "his actions actually caused irreparable damage to the company by not representing us.  She wasn't mad at the late delays.  Those happen.  She was disturbed by her dealings with him."  Goldman stated that he had been having issues with Milne's "lack of assistance in . . . collecting payables" and that this was "probably the foremost" reason his employment was terminated.  The incident with Demars was "the straw that broke the camel's back."

A declaration from Demars stated that Milne was often difficult to contact and that it took him a long time to get information.  Furthermore, when she did get information from Milne, it sometimes was inaccurate.  When Demars confronted Milne about her difficulties getting in contact with him, he responded that he felt no need to report to her if he had no information to report, and that he had difficult getting information on his end.  When Demars pressed Milne about the delays, he blamed Accurcast and was critical of Accurcast's management.  Demars stated that this presented Accurcast in a negative light, made Accurcast "a high maintenance supplier," and led her not to want to deal with Milne.

In an email from Milne to Goldman, Milne stated that Demars had asked him whether it was him or Accurcast that was causing the delays and that he responded by saying, "I've [been] falling on the sword for a long time regarding the delays and I'll tell

you that I get you the information shortly after I receive the information from Accurcast." Milne stated that this was the only part of his conversation with Demars that could have been interpreted as throwing Accurcast under the bus.

In a declaration, Milne stated that he was a resident of Grand Blanc, Michigan, when he executed the Sales Agency Agreement with Accurcast and that he remains a resident there today. Milne never traveled to Accurcast's headquarters to negotiate, although he did visit the headquarters "on one occasion where Accurcast introduced me to some employees and gave me a tour of its facilities to provide me with more information about the company." The negotiations over the agreement centered on which customers Milne would work with and the amount of his commission. Milne performed "virtually all" of his work for Accurcast from his home office, traveling outside of Michigan only five times during his two-and-a-half years with Accurcast. In his deposition, Milne stated that Magna was not going to continue using Accurcast because a competitor was less expensive and because of issues regarding Accurcast's supply chain management, quality, and delivery.

### III.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) authorizes the Court to grant summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." There is no genuine issue of material fact if there is not a factual dispute that could affect the legal outcome on the issue. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In determining

whether to grant summary judgment, this Court "must construe the evidence and draw all reasonable inferences in favor of the nonmoving party." Hawkins v. Anheuser-Busch, Inc., 517 F.3d 321, 332 (6th Cir. 2008).

**IV.   ANALYSIS**

1.   Count 1 - Breach of Contract

Plaintiffs claim that Accurcast breached the Sales Agency Agreement by failing to pay all of the commissions that Plaintiffs were owed. In essence, this claim involves two different sets of commissions: those owed before the termination of the agreement and those earned following the termination of the agreement. During oral argument, Milne stated that the post-termination commissions were really the issue.

As to the commissions owed before the termination of the agreement, Goldman stated in a declaration that Milne earned US$166,437.77 and CAD$2,339.48 over the life of the contractual relationship (i.e. until Accurcast terminated the agreement on August 25, 2008). (Doc. 20, exh. 3). According to Goldman, Accurcast has paid all of this to Milne with the exception of US$3,560.13. That money has not been paid because Accurcast has not received payment from the customer. Under the Sales Agency Agreement, Milne was to be paid a commission for his services within 10 days of Accurcast's receipt of payment for the applicable sales. As Milne has not presented any evidence to contradict Goldman's declaration, the undisputed evidence shows that Milne is not entitled to any additional pre-termination commissions at this time.[2]

---

[2] Plaintiffs briefly assert that Accurcast's failure to timely pay pre-termination commissions constituted a prior material breach by Accurcast, but they do not show

Plaintiffs also contend that Accurcast has breached the agreement by failing to pay post-termination commissions.  Accurcast does not dispute that it has not paid post-termination commissions.  Under the Sales Agency Agreement, Accurcast was not obligated to pay post-termination commissions if it validly terminated the agreement without notice, which Accurcast contends it did.  Accurcast could terminate the agreement without notice if Milne breached any material term of the agreement.

Plaintiffs argue that there are genuine issues of material fact because there is contradictory evidence regarding the particular grounds for which Accurcast terminated the agreement.  In particular, Plaintiffs note that his termination letter refers to more than one act on Milne's part having caused the termination, whereas McLaughlin's testimony was that the termination was based only on the complaints from Demars.

Plaintiffs' argument misses the point because there is no dispute that Demars told Goldman and McLaughlin that Milne threw Accurcast "under the bus," and had complained to her about the Accurcast's management.  In addition, she stated that Milne was difficult get a hold of and that he sometimes provided her with inaccurate information.  She went on to tell them that Milne's actions had cast Accurcast in a negative light, made Accurcast "a high maintenance supplier," and led her to not want to deal with Milne.  In light of these undisputed facts, no reasonable juror could fail to find that Milne had breached the Sales Agency Agreement, which required him to, among other things, promote Accurcast positively, and satisfy the customers.  Accordingly,

---

how this abrogates Accurcast's right to terminate the agreement without notice in the event of Milne's breach.  Accordingly, they have failed to show that this creates a genuine issue of material fact.

8

because Milne breached a material term of the agreement, Accurcast had the right to terminate the agreement without notice. Although Accurcast may have had additional or other motives for terminating the agreement, these other motives would not show that Accurcast did not have the right to terminate the agreement as a result of Milne's breach of a material term of the agreement.

Plaintiffs also argue that the Sales Agency Agreement improperly gave Accurcast the "sole discretion" to terminate the agreement without notice and, which saved them from having to pay post-termination commissions. This argument fails, however, because Accurcast did not have unfettered discretion to terminate the agreement without notice. Instead, Accurcast could only terminate the agreement without notice if Milne breached the agreement.[3]

Plaintiffs do provide evidence disputing the truth of some of Demars' statements to Goldman and McLaughlin about Milne's actions, but many of Demars' assertions are largely undisputed, and Milne has not provided any evidence disputing the fact that Demars expressed to Goldman and McLaughlin her extreme dissatisfaction with Milne's performance and her belief that Milne had presented Accurcast in a negative light. Thus, the undisputed evidence demonstrates that Milne breached the sales agreement by failing to satisfy Accurcast's customers and failing to present Accurcast in a positive light.

Plaintiffs contend that the statements of Goldman and McLaughlin concerning what Demars told them are inadmissible hearsay. This argument fails because the

---

[3] There were also other grounds upon which Accurcast could terminate the agreement without notice, but they are not relevant to this motion.

statements demonstrate Goldman and McLaughlin's state of mind, which is not hearsay because it is not using the statements to prove the truth of the matter asserted in the statements. See Anderson v. United States, 417 U.S. 211, 219 (1974) ("Out-of-court statements constitute hearsay only when offered in evidence to prove the truth of the matter asserted."). Furthermore, the content of those statements is largely set forth in Demars' own non-hearsay declaration.

Accordingly, because Accurcast has presented undisputed evidence that Milne failed to promote Accurcast positively and satisfy its customers, the Court grants Accurcast's request for summary judgment of Plaintiffs' breach of contract claim (Count 1).

2.  Count 2 - Accounting

Accurcast argues that Plaintiffs' claim for an accounting should be dismissed because it an accounting is unnecessary as discovery will be sufficient to determine any amounts owed under the agreement. Plaintiffs' did not address this issue in their response. The Court grants Accurcast's request for summary judgment of this claim because the Court is granting Defendant's request for summary judgment of Plaintiffs' other claims and, even if the other claims did not fail, Plaintiffs have made no showing as to why an accounting would be necessary.

3.  Count 3 - Violation of Michigan Sales Representatives Act, Michigan Compiled Laws § 600.2961 et seq.

Accurcast argues that this claim fails because Ontario law applies to the Sales Agency Agreement due to the agreement's choice-of-law provision.  Accurcast notes that Michigan choice-of-law principles respect the parties' expressed choice of law unless there are compelling reasons for not doing so.  Milne responds that Michigan law should apply because the MSRA forbids any waiver of the statute's protections and because Michigan has a more substantial connection to the parties' contract.

It is well settled that federal courts sitting in diversity must apply the choice-of-law principles of the forum state.  <u>Klaxon Co. v. Stentor Elec. Mfg. Co.</u>, 313 U.S. 487, 496 (1941).  In Michigan, the parties' choice of law is applied if the issue is one that the parties could resolve by an express contractual provision and so long as none of the following are true: (1) "the chosen state has no substantial relationship to the parties or the transaction," (2) "there is no reasonable basis for choosing that state's law," or (3) the application of the chosen state's law would be contrary to a fundamental policy of a state (i) with a materially greater interest than the chosen state in the determination of the issue and (ii) whose law would be applicable in the absence of an effective choice of law by the parties.  <u>Hudson v. Mathers</u>, 283 Mich. App. 91, 96-97 (2009).

The Sales Agency Agreement in this case clearly indicates that the parties agreed to have Ontario law applied to disputes that arise under the agreement.  It is clear that Ontario has a substantial relationship to the parties and the transaction in this case because it is where Accurcast is located and where all of the orders procured by Milne were filled.  Furthermore, this substantial connection provides a reasonable basis for the parties to have chosen Ontario law.

The final possible basis for ignoring the Sales Agency Agreement's choice-of-law provision requires both (1) that Michigan have a materially greater interest than Ontario in the determination of the issue and (2) that the application of Ontario's law be contrary to a fundamental policy of Michigan. Id. The Court does not find that Michigan has a materially greater interest in the outcome of this suit as compared to Ontario. It is true that Accurcast contracted with Milne, a Michigan resident, and that Milne performed the majority of his work for Accurcast by communicating with customers from his office in Michigan. But, Accurcast itself is located in Ontario, the decision to terminate the agreement was made in Ontario, all of the orders that Milne secured were received and fulfilled in Ontario by Accurcast, and payment for the orders was directed to Accurcast in Ontario. In addition, a significant portion of Milne's work involved procuring orders from non-Michigan companies, so this is not a case where he was hired solely to do work within Michigan. Accordingly, the Court cannot find that Michigan has a materially greater interest than Ontario in the determination of this issue. Thus, none of the grounds for ignoring a contract's choice-of-law provision are present in this case. See id.

Plaintiffs assert, however, that their MSRA claim cannot be waived by the choice-of-law provision because the statute forbids waiver of its protections. In particular, § 600.2961(8) states, "A provision in a contract between a principal and a sales representative purporting to waive any right under this section is void." Plaintiffs also cite to Walters v. Bloomfield Hills Furniture, 228 Mich. App. 160 (1998). In that case, the plaintiff and his employer had a preexisting agreement that entitled him to post-termination commissions. Id. at 161. Subsequently, the plaintiff signed a letter

12

prepared by his employer that stated that the plaintiff would not receive certain post-termination commissions. Id. at 161-62. The court held that this letter constituted a waiver of the plaintiff's rights under the MSRA and, therefore, was barred by § 600.2961(8). Id. at 165-66.

Milne's argument concerning § 600.2961(8) fails because this provision only has effect *if* Michigan law applies. Section 600.2961(8) cannot displace the choice-of-law analysis that determines which state's law is to be applied. It is only if those choice-of-law principles dictate the application of Michigan law that § 600.2961(8) becomes relevant. As already discussed, the Court must apply the choice of law principles of the forum, which in this case is Michigan, and, as already discussed, Michigan respects the parties' choice of law in situations like this. Therefore, the parties' choice of Ontario law is to be respected, and Michigan law, including § 600.2961(8), has no bearing on the determination of the parties' rights under their contract.

Thus, the Court will grant Accurcast's request for summary judgment of Plaintiffs' claim under the Michigan Sales Representatives Act, Michigan Compiled Laws 600.2961 *et seq*.

### V. CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment is **GRANTED.**

SO ORDERED.

                                  s/Marianne O. Battani
                                  MARIANNE O. BATTANI
                                  UNITED STATES DISTRICT JUDGE

DATED: January 25, 2010

## CERTIFICATE OF SERVICE

     Copies of this Order were served upon counsel of record on this date by ordinary mail and/or electronic filing.

                                  s/Bernadette M. Thebolt
                                  DEPUTY CLERK